# EXHIBIT A



## CSC

ZZC / ALL
Transmittal Number: 16664435
Date Processed: 05/22/2017

# Notice of Service of Process

| | |
|---|---|
| Primary Contact: | Byron Hayes<br>Zimmer Holdings, Inc.<br>345 East Main Street<br>Warsaw, IN 46580 |
| Electronic copy provided to: | Dona Reust<br>Chad Phipps<br>Lisa Dunkin<br>Brandee Martinsky<br>Maureen Smith |

RECEIVED BY

MAY 2 4 2017

LEGAL DEPARTMENT

| | |
|---|---|
| Entity: | Zimmer US, Inc.<br>Entity ID Number  2451858 |
| Entity Served: | Zimmer, Inc. |
| Title of Action: | Theodore Weber vs. Zimmer, Inc. |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Product Liability |
| Court/Agency: | Orange County Superior Court, California |
| Case/Reference No: | 30-2017-00909045-CU-PL-CJC |
| Jurisdiction Served: | California |
| Date Served on CSC: | 05/18/2017 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Jeffrey A. Milman<br>949-640-8222 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscglobal.com

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

ZIMMER, INC., an Indiana corporation; and DOES 1 through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

THEODORE WEBER and MARCIA WEBER

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**03/15/2017** at 04:23:29 PM
Clerk of the Superior Court
By Monique Ramirez, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Orange County Superior Court<br><br>700 Civic Center Drive West<br>Santa Ana, CA 92701 | **CASE NUMBER:** *(Número del Caso):* 30-2017-00909046-CU-PL-CJC<br><br>Judge Geoffrey T. Glass |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jeffrey A Milman, Esq/Hodes Milman Liebeck, LLP, 9210 Irvine Center Dr, Irvine, CA 92618   949-640-8222

| | | | |
|---|---|---|---|
| **DATE:** 03/15/2017<br>*(Fecha)* | DAVID H. YAMASAKI, Clerk of the Court | Clerk, by *(Secretario)* | , Deputy *(Adjunto)* |

Monique Ramirez

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [X] on behalf of *(specify):* ZIMMER, INC.

    under: [X] CCP 416.10 (corporation)   [ ] CCP 416.60 (minor)
    [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
    [ ] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
    [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 (Rev. July 1, 2009) | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465.<br>*www.courtinfo.ca.gov* |

1  Jeffrey A. Milman, Esq., SBN 99072
   Benjamin T. Ikuta, Esq., SBN 260878
2  HODES MILMAN LIEBECK, LLP
   9210 Irvine Center Drive
3  Irvine, California 92618
   (949) 640-8222
4  (949) 336-8114
   jmilman@hml.law
5  bikuta@hml.law

6  Attorney for Plaintiffs,
   THEODORE WEBER & MARCIA WEBER
7

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**03/15/2017** at 04:23:29 PM
Clerk of the Superior Court
By Monique Ramirez,Deputy Clerk

8

9                      SUPERIOR COURT OF CALIFORNIA

10          COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

11

12  THEODORE WEBER and MARCIA WEBER,      )  Case No. 30-2017-00909046-CU-PL-CJC
                                          )
13          Plaintiffs,                   )  *Assigned for all purposes to:*
                                          )  Judge   Judge Geoffrey T. Glass
14  vs.                                   )  Dept.
                                          )
15  ZIMMER, INC., an Indiana corporation; and DOES )  **COMPLAINT FOR:**
16  1 through 20, inclusive,              )
                                          )  (1) STRICT PRODUCT LIABILITY,
17          Defendants.                   )  (2) NEGLIGENCE,
                                          )  (3) BREACH OF IMPLIED WARRANTIES,
18                                        )  (4) BREACH OF EXPRESS WARRANTY,
                                          )  (5) BREACH OF SONG-BEVERLY,
19                                        )  CONSUMER WARRANTY ACT, and
                                          )  (6) LOSS OF CONSORTIUM
20                                        )
                                          )  **JURY TRIAL DEMANDED**
21                                        )
                                          )  Complaint Filed:
22                                        )  Trial date:
                                          )
23                                        )

24

25      Plaintiffs THEODORE WEBER and MARCIA WEBER ("Plaintiffs"), allege on information and

26  belief against ZIMMER, INC., an Indiana corporation;; and DOES 1 through 20, inclusive,

27  ("Defendants"), the following:

28
                                          1
                        COMPLAINT FOR DAMAGES AND JURY DEMAND

## INTRODUCTION AND SUMMARY OF ACTION

1.    Since 2008, Defendants have known that their hip replacement device - the Durom Cup (hereinafter the "Durom Hip Device") - is prone to fail within approximately two years of implantation despite the fact that such hip implant devices are designed to last more than fifteen years. They have also known that the implant's metal "ball" and "socket" bearings that make up the hip-joint generate metal debris over time from wear and tear that can spread throughout the patient's surrounding bone and tissue. As a result of these defects, patients that have had the devices implanted have endured, or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation causing damage or death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the faulty devices giving rise to more debilitation, a prolonged recovery time, and an increased risk of complications and death from surgery. But rather than recalling the Durom Hip Devices upon first receiving notice in 2008 of complaints made to the U.S. Food & Drug Administration ("FDA") and receiving direct notice of the defects discussed above, Defendants continued to aggressively market the Durom Hip Devices, claiming that that they were a safe and effective hip replacement system.

2.    In July 2008, Defendants issued an "Urgent Device Correction" letter which suspended marketing of the Durom Hip Devices in the United States, stating that US surgeons needed additional training and that Defendants would revise the product labeling for the Durom Hip Devices. The letter also stated that once training and labeling revision was complete, Defendants would reinstate marketing of the Durom Hip Devices in the United States.

3.    Plaintiff's suffering could easily have been prevented. Plaintiff and those like him would not have suffered from unnecessary pain and debilitation, and the need to undergo subsequent revision surgery had Defendants warned the public of the dangers of the Durom Hip Implant Devices after 2008 when dozens of complaints began being made both to the Defendants and to the FDA regarding the device's failures. Or, even better, would have been if Defendants had taken the affirmative step of recalling the Durm Hip Implant Devices at that time, as opposed to continuing to aggressively market the Drum Hip Implant Devices. But Defendants' failure to recall these devices places on thousands of

2

1   Americans, including Plaintiff, the burden of living with the consequences of these faulty devices for

2   years, if not the rest of their lives. Plaintiff seeks redress for his injuries.

3                                            **PARTIES**

4         4.      Plaintiffs THEODORE WEBER and MARCIA WEBER, who are and were at all relevant

5   times herein, citizens of the State of California and reside in the County of Orange, California.

6         5.      On information and belief, Defendants ZIMMER, INC. ("Zimmer") is a corporation

7   organized and existing under the laws of Indiana with its primary place of business in Warsaw, Indiana.

8   Defendant designed, manufactured, and/or sold the Durom Hip Implant Device that is the subject of this

9   lawsuit.

10        6.      The true names and capacities of Does 1 through 20 are unknown to Plaintiff. Plaintiff is

11  informed and believes and thereon alleges that each of these Defendants are in some way liable for the

12  events referred to in this Complaint and caused damage to Plaintiff.  Plaintiff will amend this Complaint

13  and insert the correct names and capacities of those Defendants when they are discovered.

14        7.      At all times mentioned, each of the Defendants-including DOES 1 through 20-was the

15  representative, agent, employee, joint venturer, or alter ego of each of the other defendants and in doing

16  the things alleged herein was acting within the scope of its authority as such.

17        8.      Zimmer and DOES 1 through 20 are collectively referred to herein as "Defendants."

18                                  **FACTUAL BACKGROUND**

19  **A.    The Zimmer Durom Cup System is Defective, Unsafe and Has Not Been Adequately Tested**

20        9.      The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The

21  hip joint is often characterized as a ball and socket joint.  The acetabulum is the cup shaped socket

22  portion of the hip and the femoral head (ball) at the top of the femur bone rotates within the curved

23  surface of the acetabulum.

24        10.     A total hip system replaces the body's natural joint with an artificial one, usually made out

25  of metal, plastic, or ceramic.  A typical hip replacement system consists of four separate components: (1)

26  a femoral stem, (2) a femoral head, (3) a liner (bearing surface), and (4) an acetabular shell.  After the

27  surgeon hollows out a patient's femur bone, the metal femoral stem is implanted.  The femoral head is

28

                                                3

                        COMPLAINT FOR DAMAGES AND JURY DEMAND.

1   usually a metal ball that is fixed on top of the femoral stem.  The femoral head forms the hip joint that

2   can rotate when it is placed inside a plastic, ceramic, or metal liner that is attached to the interior portion

3   of the metal acetabulum cup (socket) comprised of metal on its outer shell.  When complete, the femoral

4   stem anchors the metal femoral head that rotates within the liner sitting inside the acetabular cup.

5       11.    The Durom Hip is critically different than most hip replacements since it uses a metal

6   acetabular liner instead of a polyethylene plastic acetabular liner.  The Durom Hip with a metal liner is a

7   "metal-on-metal" device due to the fact that both articulating surfaces - the femoral head (ball) and

8   acetabulum liner (socket) - are comprised of cobalt-chromium (CoCr) metal.  Therefore, the metal-on-

9   metal design forces metal to rub against metal with the full weight and pressure of the human body

10  creating metallic debris to be released into the Plaintiff's hip socket and blood stream.  Because of

11  Defendants' defective design for the Durom Hip, hundreds of patients--including Plaintiff--have been

12  forced to undergo surgeries to replace the failed hip implants.

13      12.    The Durom Hip is a Class III medical device.  Class III devices are those that operate to

14  sustain human life, are of substantial importance in preventing impairment of human health, or pose

15  potentially unreasonable risks to patients.

16      13.    The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938

17  ("MDA"), in theory, require Class III medical devices, including the Durom Hip, to undergo premarket

18  approval by the FDA, a process which obligates the manufacturer to design and implement a clinical

19  investigation and submit the results of the investigations to the FDA.

20      14.    Premarket approval is a rigorous process that requires a manufacturer to submit what is

21  typically a multivolume application that includes, among other things, full reports of all studies and

22  investigations of the device's safety and effectiveness that have been published or should reasonably be

23  known to the applicant; a full statement of the device's components, ingredients, and properties, and of

24  the principle or principles of operation; a full description of the methods used in, and the facilities and

25  controls used for, the manufacture, processing, and, when relevant, packing and installation of such

26  device; samples or device components required by the FDA; and a specimen of the proposed labeling.

27  ///

28

4

15.     The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

16.     A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – was not required to undergo premarket approval.

17.     In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a pre-MDA device (i.e., a device approved prior to May 28, 1976). This exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then approve the new device for sale in the United States.

18.     The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

19.     Instead of assuring the safety of the Durom Hip through clinical trials, Defendants sought to market the Durom Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, Defendants submitted a section 510(k) premarket notification of intent to market the Durom Hip.

20.     By telling the FDA that the Durom Hip's design was "substantially equivalent" to other hip components and products on the market, Defendants were able to avoid the safety review required for premarket approval under FDA regulations including clinical trials.

21.     The FDA cleared the Durom Hip for sale by means of the abbreviated 510(k) process and consequently the FDA did not require the Durom Hip to undergo clinical trials.

22.     The 510(k) notification for the Durom Hip includes Defendants assertion that it believes the Durom Hip to be substantially equivalent to devices that had never been reviewed for safety and effectiveness.

///

5

23. Significantly, unlike the premarket approval process, the 510(k) notification process does not call for scrutiny – or even clinical testing – of a device's safety and effectiveness.

24. A finding of substantial equivalence is not equivalent to a finding of a device's safety and effectiveness.

25. Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the Durom Hip's safety and effectiveness, but rather only a determination of equivalence to devices that they underwent no safety and effectiveness review.

**Defendants Have Continued to Market the Durom Hip Despite Hundreds of Reported Adverse Events – As Such, Defendants Should Have Recalled Or Notified The Public and Health Care Industry of The Defective Problems.**

26. Defendants have received hundreds of reports associated with the Durom Hip since 2008, and the number is expected to grow. From January 1, 2011 to July 30, 2011, the FDA received over 300 self-reported adverse events regarding the Durom Hip (metal-on-metal). Reported symptoms range from pain, infection, inflammation, feeling as if dislocating, loosening of the implant and necrotic tissue in and around the hip joint, catastrophic failure, premature wear, disarticulation, and disassembly.

27. Defendants have continued to receive hundreds of similar complaints since 2008 reporting that the Durom Hip had failed and forced patients to undergo painful and risky surgery to remove and replace the failed hip.

28. Consequently, Defendants were fully aware that the Durom Hip was defective and that dozens of patients already had been injured by the Durom Hip. Based on this information, Defendants should have recalled the Durom Hip in 2008. At a minimum, Defendants should have permanently stopped selling the defective implant when it became aware that it had catastrophically failed in patients. Despite the retraining and revision to product labeling, patients continued to report failures of the Durom Hip.

29. Had Defendants conducted clinical trials of the Durom Device before it was first released on the market in the late 2000's, they would have discovered at that time what they ultimately learned in and around 2008 - that the Durom Hip results in a high percentage of patients developing pain,

6

1   metallosis, biologic toxicity and an early and high failure rate due to the release and accumulation of

2   metal particles in the patient's surrounding tissue when there is friction (wear or edge-loading) of the

3   cobalt-chromium metal femoral head that rotates within the cobalt-chromium metal acetabular liner.

4        30.     The metallic particulates released by friction of the metal-on-metal surfaces can become

5   toxic causing metallosis or cobaltism giving rise to pseudotumors or other conditions.  The formation of

6   metallosis, pseudotumors, and infection and inflammation causes severe pain and discomfort, death of

7   surrounding tissue and bone loss, and a lack of mobility.

8        31.     Despite the knowledge of the Durom Hip's defect and that it had failed hundreds of times,

9   causing hundreds of patients to undergo the agony of another surgery, Defendants continued to market

10   and sell the defective Durom Hip implant. In so doing, Zimmer actively concealed the known defect from

11   doctors and patients-- including Plaintiff and his doctor--and misrepresented that the Durom Hip was a

12   safe and effective medical device.

13        32.     Despite knowledge by these Defendants, Defendants failed to warn medical providers

14   and/or their customers of the unreasonable dangers associated with the Durom Hip and allowed for the

15   continued sale and installation into patients' bodies.

16        33.     To this day, Defendants continue to sell the defective Durom Hip to unsuspecting patients

17   without any warning about the risks or the failures that have been reported over the years.

18        34.     Defendants marketed the Durom Hip as high performance hip replacements and as

19   superior products that would allow patients to return to their more active lifestyles.  Defendants also

20   advertised that the Durom Hip would last longer than other hip replacement products.

21        35.     Defendants have known for years that implantation of their Durom Hip and other metal-

22   on-metal total hip replacement systems results in metallosis, biologic toxicity and an early and high

23   failure rate.  Once the body is exposed to and absorbs the toxic metallic ions and particulate debris from

24   the Durom Hip, inflammation occurs, causing severe pain, necrosis (death) of the surrounding tissue and

25   bone loss.  Pseudotumors also develop and grow as a direct and proximate result of the toxic metallic

26   particles and ions released from the metal-on-metal hip components.

27        36.     There is no non-surgical solution for elevated cobalt levels.

28

7

COMPLAINT FOR DAMAGES AND JURY DEMAND

1    **Mr. Weber's Durom Hip Implant Device Was Defective and Failed, Forcing**

2    **Him to Undergo an Additional Painful and Risky Surgery.**

3        37.    In 2006, Mr. Weber underwent surgical procedures to implant the Durom Hip Implant

4    Device in his hip.

5        38.    Following his hip surgery, Mr. Weber suffered from ongoing discomfort and pain in his

6    hip. It became increasingly painful for him to move, bear weight and walk, to move his legs, and to rise

7    from a seated position, to walk and he suffered loss of and limitation of motion.

8        39.    Mr. Weber underwent revision surgery to remove his failed Durom Hip Implant Device in

9    his hip and replace it with a new hip implant system on May 5, 2016.

10       40.    Despite Mr. Weber's reasonable efforts to ascertain the cause of his ongoing discomfort

11   and pain, he was not aware that his discomfort and pain were the result of wrongdoing until May 2016,

12   when he was advised he required revision of his failed Durom Hip Implant Device.

13       41.    Revision surgeries are generally more complex than the original hip replacement surgery,

14   often because there is a reduced amount of bone in which to place the new hip implants. Revision

15   surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a

16   higher rate of complications.

17       **The Defective Durom Hip Implant Device And The Defendants' Conduct Caused**

18       **Permanent Injuries And Substantial Damages to Mr. Weber.**

19       42.    Having to go through a revision surgery subjects Mr. Weber to much greater risks of

20   future complications than he had before the revision surgery. For example, several studies have found

21   that revision surgery has a much higher risk of dislocation compared with an original hip replacement

22   surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's

23   Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation

24   compared with 3.9 percent of patients who underwent a original hip replacement surgery. In other words,

25   hip replacement patients who have undergone a revision surgery are almost four times more likely to

26   suffer from a hip dislocation than those who have not. (Phillips CB, et al. Incidence rates of dislocation,

27

28

COMPLAINT FOR DAMAGES AND JURY DEMAND

1   pulmonary embolism, and deep infection during the first six months after elective total hip replacement.

2   American Journal of Bone and Joint Surgery 2003; 85:20–26.).

3       43.   As a direct and proximate result of the failure of his defective Durom Hip Implant Device

4   and the Defendants' wrongful conduct, Mr. Weber sustained and continues to suffer economic damages

5   (including medical and hospital expenses), severe and possibly permanent injuries, pain, suffering and

6   emotional distress, loss of earning capacity, and loss of wages. As a result, Mr. Weber has sustained and

7   will continue to sustain damages in an amount to be proven at trial, but which will far exceed the

8   jurisdictional minimum of this Court.

9   **FIRST CAUSE OF ACTION**<br>**(Strict Product Liability)**

10   **Against All Defendants**

11       44.   Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully

12   set forth here and further allege as follows:

13       45.   Defendants designed, manufactured, promoted, distributed, marketed, and sold the Durom

14   Hip Implant Device.

15       46.   At all times material hereto, the Durom Hip Implant Device that was designed,

16   manufactured, promoted, distributed, marketed, and sold by the Defendants was expected to reach, and

17   did reach, prescribing physicians and consumers, including Mr. Weber, without substantial change in the

18   condition in which it was sold.

19       47.   At all times material hereto, the Durom Hip Implant Device that was designed,

20   manufactured, promoted, distributed, marketed, and sold by the Defendants was in a defective and

21   unreasonably dangerous condition at the time it was placed in the stream of commerce. Such condition

22   included, but is not limited to, one or more of the following particulars:

23       (a)   When placed in the stream of commerce, the Durom Hip Implant Device contained

24   manufacturing defects, subjecting Mr. Weber and others to risks, including the risk that the acetabular

25   component would not properly grow into the bone, causing the hip system to prematurely fail and

26   requiring a complex, risky, and painful surgery to remove and replace the defective product;

27   ///

28

9

1    (b)    When placed in the stream of commerce, the Durom Hip Implant Device contained

2    unreasonably dangerous design defects and was not reasonably safe for the intended use, subjecting Ms.

3    Weber and others to risks, including the risk that the acetabular component would not properly grow into

4    the bone, causing the hip system to prematurely fail and requiring a complex, risky, and painful surgery

5    to remove and replace the defective product;

6    (c)    The Durom Hip Implant Device was insufficiently tested; and

7    (d)    The Durom Hip Implant Device was not accompanied by adequate instructions and/or

8    warnings to fully inform Mr. Weber or his physicians of the full nature or extent of the risks associated

9    with its use.

10    48.    Defendants knew or should have known of the dangers associated with the use of the

11    Durom Hip Implant Device, as well as the defective nature of the Durom Hip Implant Device. Despite

12    this knowledge, Defendants continued to manufacture, sell, distribute, promote and supply the Durom

13    Hip Implant Device so as to maximize sales and profits at the expense of the public health and safety.

14    Defendants' conduct was done in conscious disregard of the foreseeable harm caused by the Durom Hip

15    Implant Device and in conscious disregard for the rights and safety of consumers such as Mr. Weber.

16    49.    Mr. Weber and his doctor used the Zimmer Durom Hip System as directed for its intended

17    purpose.

18    50.    At all times herein mentioned, the Durom Hip Implant Device was defective, and

19    Defendants knew that it was to be used by the user without inspection for defects therein. Moreover,

20    neither Mr. Weber nor his physician knew or had reason to know at the time of the use of the subject

21    products, of the existence of the aforementioned defects. Neither Mr. Weber nor his physicians could

22    have discovered the defects in the Durom Hip Implant Device through the reasonable exercise of care.

23    51.    The Durom Hip Implant Device had not been materially altered or modified prior to its

24    implantation in Mr. Weber.

25    52.    As a direct and proximate result of the failure of the defective Durom Hip Implant Device,

26    Plaintiff suffered the injuries and damages as described herein.

27

28    ///

10

COMPLAINT FOR DAMAGES AND JURY DEMAND

## SECOND CAUSE OF ACTION
### (Negligence)
### Against All Defendants

53.     Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth here and further allege as follows:

54.     Defendants had a duty to exercise reasonable care in the design, manufacture, testing, marketing and distribution into the stream of commerce of the Durom Hip Implant Devices, including a duty to insure that the Durom Hip Implant Devices did not pose a significantly increased risk of adverse events.

55.     Defendants failed to exercise reasonable care in the design, manufacture, testing, marketing and distribution into the stream of commerce of the Durom Hip Implant Devices. Defendants knew or should have known that the Durom Hip Implant Devices could fail early in patients, therefore giving rise to pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery, and therefore was not safe for use by Plaintiff.

56.     Despite the fact that Defendants knew or should have known that the Durom Hip Implant Devices could fail early in patients, therefore giving rise to pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery, Defendants continued to market the Durom Hip Implant Devices as a safe and effective hip replacement systems.

57.     In so doing, the Defendants failed to act as a reasonable manufacturer of hip implants.

58.     As a direct and proximate result of Defendants' negligence, Plaintiff has suffered significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty device, and will continue to suffer such damages in the future.

///
///
///

11

COMPLAINT FOR DAMAGES AND JURY DEMAND

### THIRD CAUSE OF ACTION
#### (Breach of Implied Warranties)
#### Against all Defendants

59.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth here and further allege as follows:

60.    Prior to the time that the Durom Hip Implant Device was used by Mr. Weber, Defendants impliedly warranted to Mr. Weber and his physicians that the Durom Hip Implant Device was of merchantable quality and safe and fit for the use for which it was intended.

61.    Mr. Weber and his physicians were and are unskilled in the research, design and manufacture of the Durom Hip Implant Device, and they reasonably relied entirely on the skill, judgment and implied warranty of Defendants in using the Durom Hip Implant Device.

62.    The Durom Hip Implant Device was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

63.    Defendants, by selling, delivering and/or distributing the defective Durom Hip Implant Device to Mr. Weber breached the implied warranty of merchantability and fitness and caused Mr. Weber to suffer severe pain and emotional distress, incur medical expenses, and incur a loss of earning capacity.

64.    As a result of the aforementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

### FOURTH CAUSE OF ACTION
#### (Breach of Express Warranty)
#### Against all Defendants

65.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully set forth here and further allege as follows:

66.    At all times herein mentioned, Defendants expressly warranted to Mr. Weber and Mr. Weber's physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for

///

12

1  physicians, medical patients and the general public, that the aforementioned Durom Hip Implant Device

2  was safe, effective, fit and proper for its intended use.

3      67.    In utilizing the aforementioned Durom Hip Implant Device, Mr. Weber and his physicians

4  relied on the skill, judgment, representations and foregoing express warranties of Defendants.

5      68.    Said warranties and representations were false in that the aforementioned Durom Hip

6  Implant Device was not safe and was unfit for the uses for which it was intended.

7      69.    As a result of the foregoing breach of express warranties by Defendants, Plaintiff suffered

8  injuries and damages as alleged herein.

9
**FIFTH CAUSE OF ACTION**
(Breach of Song-Beverly Consumer Warranty)
**Against All Defendants**

10

11      70.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully

12  set forth here and further allege as follows:

13      71.    Defendants manufactured the Durom Hip Implant Device, an "assistive device" as defined

14  by the Song Beverly Act, for the purpose of its eventual retail sale to buyers in California.

15      72.    In 2007, Defendants sold to Mr. Weber the Durom Hip Implant Devices.

16      73.    Pursuant to California Civil Code section 1792, the sale to Mr. Weber of the Durom Hip

17  Implant Device was accompanied by Defendants' implied warranty that the Durom Hip Implant Device

18  was of merchantable quality.

19      74.    Defendants breached the implied warranty that the Durom Hip Implant Device was

20  merchantable because it was not fit for the ordinary purposes for which the goods are used.

21  Consequently, Mr. Weber did not receive merchantable goods as impliedly warranted by Defendants.

22      75.    At the time of the sale of the Durom Hip Implant Device to Mr. Weber, Defendants had

23  reason to know that the Durom Hip Implant Device was required for a particular purpose and that Mr.

24  Weber and his physicians were relying on Defendants' skill or judgment to select or furnish suitable

25  goods.

26      76.    Mr. Weber and his physicians relied upon Defendants' skill and judgment to select or

27  furnish suitable goods.

28

COMPLAINT FOR DAMAGES AND JURY DEMAND

1      77.    Pursuant to California Civil Code section 1792.1, the sale to Mr. Weber of the Durom Hip

2 Implant Device was accompanied by Defendants' implied warranty that the Durom Hip Implant Device

3 was specifically fit for the particular needs of Mr. Weber.

4      78.    Defendants breached the implied warranty that the Durom Hip Implant Device was

5 specifically fit for the particular needs of Mr. Weber because the product had a defect that caused it to

6 catastrophically fail when it was used as intended. This catastrophic failure occurred in May 2016.

7      79.    As a direct and proximate result of Defendants' breach of the implied warranties described

8 above, Plaintiff sustained significant injuries and damages as described herein. Plaintiff also sustained

9 incurred medical expenses, including the cost to replace the defective Durom Hip Implant Device, and

10 sustained incidental and consequential damages to be proven at trial.

11      80.    Also as a direct result of Defendants' breach of the implied warranties described above,

12 Plaintiffs have incurred and continue to incur attorneys' fees in an amount to be proven at trial.

13                    **SIXTH CAUSE OF ACTION**
**(Loss of Consortium)**
14                     **Against All Defendants**

15      81.    Plaintiffs incorporate by reference all foregoing paragraphs of this Complaint as if fully

16 set forth here and further allege as follows:

17      82.    As a direct and proximate result of the failure of the defective Durom Hip Implant Device

18 and Defendants' wrongful conduct, MARCIA WEBER, Plaintiff THEODORE WEBER's wife, has been

19 and will continue to be deprived of the consortium, society, comfort, protection, and service of

20 THEODORE WEBER, thereby causing and continuing to cause MARCIA WEBER economic damages,

21 grief, sorrow, mental anguish, emotional distress, and pain and suffering.

22 /// 

23 /// 

24 /// 

25 /// 

26 /// 

27 /// 

28

14

COMPLAINT FOR DAMAGES AND JURY DEMAND

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs demand judgment for the following:

1. Past and future medical and incidental expenses, according to proof;

2. Past and future loss of earnings and/or earning capacity, according to proof;

3. Past and future general damages, including damages for loss of consortium, according to proof;

4. Punitive and exemplary damages in an amount to be determined at trial;

5. Prejudgment and post judgment interest;

6. Attorneys' fees pursuant to the Song-Beverly Act and Code of Civil Procedure Section 1021.5;

7. Costs to bring this action; and

8. Such other and further relief as the court may deem just and proper.

Dated: March 9, 2017                    HODES MILMAN LIEBECK, LLP

By: _____
Jeffrey A. Milman
Benjamin T. Ikuta
9210 Irvine Center Drive
Irvine, California 92618
(949) 640-8222

Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated: March 9, 2017                    HODES MILMAN LIEBECK, LLP

By: _____
Jeffrey A. Milman
Benjamin T. Ikuta
9210 Irvine Center Drive
Irvine, California 92618
(949) 640-8222

Attorneys for Plaintiffs

15

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jeffrey A. Milman, Esq.        SBN 99072<br>Hodes Milman Liebeck, LLP<br>9210 Irvine Center Drive<br>Irvine, CA  92618<br>TELEPHONE NO.: 949-640-8222   FAX NO.: 949-640-8294<br>ATTORNEY FOR (Name): Plaintiffs, THEODORE WEBER and MARCIA WEBER | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**03/15/2017** at 04:23:29 PM<br>Clerk of the Superior Court<br>By Monique Ramirez, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, Ca  92701
BRANCH NAME: Central Justice Center

CASE NAME:
Theodore Weber and Marcia Weber v. Zimmer, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER | 30-2017-00909046-CU-PL-CJC |
|---|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE: Judge Geoffrey T. Glass<br><br>DEPT: | |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [✓] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [ ] nonmonetary; declaratory or injunctive relief.   c. [ ] punitive
4. Number of causes of action (specify): Six
5. This case [ ] is [✓] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 9, 2017
Jeffrey A. Milman, Esq.                                                    SBN
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)    A260878

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice—
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach—Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case—Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ—Administrative Mandamus
Writ—Mandamus on Limited Court
Case Matter
Writ—Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal—Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

| | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**<br>STREET ADDRESS: 700 W. Civic Center DRIVE<br>MAILING ADDRESS: 700 W. Civic Center Drive<br>CITY AND ZIP CODE: Santa Ana 92701<br>BRANCH NAME: Central Justice Center | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ORANGE |
| PLAINTIFF: Theodore Weber et.al. | |
| DEFENDANT: Zimmer, Inc. | **Apr 21, 2017** |
| Short Title: Weber vs. Zimmer, Inc. | Clerk of the Superior Court<br>By: Julie Carney, Deputy |
| **NOTICE OF HEARING** | CASE NUMBER:<br>30-2017-00909045-CU-PL-CJC |

Please take notice that a(n), Case Management Conference  has been scheduled for hearing on 09/18/2017 at 09:00:00 AM in Department C32  of this court, located at  Central Justice Center .

Clerk of the Court,  By: _Julie Carney_____ , Deputy

---

**NOTICE OF HEARING**

Page: 1

Exhibit A
Page 26

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**

Central Justice Center
700 W. Civic Center DRIVE
Santa Ana 92701

**SHORT TITLE:** Weber vs. Zimmer, Inc.

| CLERK'S CERTIFICATE OF SERVICE BY MAIL | CASE NUMBER:<br>30-2017-00909045-CU-PL-CJC |
| --- | --- |

I certify that I am not a party to this cause. I certify that a true copy of the above Notice of Hearing has been placed for collection and mailing so as to cause it to be mailed in a sealed envelope with postage fully prepaid pursuant to standard court practice and addressed as indicated below. The certification occurred at Santa Ana, California, on 04/21/2017. Following standard court practice the mailing will occur at Sacramento, California on 04/24/2017.

Clerk of the Court, by: _Julie Carney_ , Deputy

HODES MILMAN LIEBECK, LLP
9210  IRVINE CENTER DRIVE
IRVINE, CA 92618

V3 1013a (June 2004)                                    Code of Civil Procedure , § CCP1013(a)

Exhibit A
Page 27

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ORANGE**

**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**INFORMATION PACKAGE**

**NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):**

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its Web site as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ORANGE

## ADR Information

**Introduction.**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

**BENEFITS OF ADR.**

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.** A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.** When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.** In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.** ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.** In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.** Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

**DISADVANTAGES OF ADR.**

ADR may not be suitable for every dispute.

**Loss of protections.** If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

L1200 (Rev. Oct. 2014)                                                          Page 2 of 4

**Less discovery.** There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.** The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays if the dispute is not resolved.** Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.** In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

> **Cases for Which Arbitration May Be Appropriate.** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

> **Cases for Which Arbitration May Not Be Appropriate.** If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.** In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

> **Cases for Which Mediation May Be Appropriate.** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

> **Cases for Which Mediation May Not Be Appropriate.** Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.** In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.** Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May <u>Not</u> Be Appropriate.** Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.** Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

**ADDITIONAL INFORMATION.**

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
- Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-852-5210
- Contact the Orange County Bar Association at (949) 440-6700
- Look in the telephone directories under "Arbitrators" or "Mediators"

Free mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA) For information regarding DRPA, contact:
- Community Service Programs, Inc. (949) 250-4058
- Orange County Human Relations (714) 480-6572

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) programs is available on the Court's website at www.occourts.org.

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*: | FOR COURT USE ONLY |
|---|---|
| Telephone No.:                    Fax No. (Optional):<br>E-Mail Address (Optional):<br>ATTORNEY FOR *(Name)*:               Bar No: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☐ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |
|---|---|

Plaintiff(s)/Petitioner(s),_____

_____

and defendant(s)/respondent(s), _____

_____

agree to the following dispute resolution process:

☐  Mediation

☐  Arbitration (must specify code)
          ☐ Under section 1141.11 of the Code of Civil Procedure
          ☐ Under section 1280 of the Code of Civil Procedure

☐  Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐  I have an *Order on Court Fee Waiver* (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐  The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals.  We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court rule 3.720 et seq.

Date: _____          _____          _____
                              (SIGNATURE OF PLAINTIFF OR ATTORNEY)          (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date: _____          _____          _____
                              (SIGNATURE OF DEFENDANT OR ATTORNEY)          (SIGNATURE OF DEFENDANT OR ATTORNEY)

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

Approved for Optional Use                                                                California Rules of Court, rule 3.221
L1270 (Rev. July 2014)

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment

